IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| L.E.A.R., <br>     Plaintiff, <br><br> v. <br><br> U.S. Citizenship and Immigration <br>     Services (USCIS); <br> U.S. Department of Homeland Securty <br>     (DHS); <br><br><br> Defendants. | No.     1:21-cv-05542 |

**COMPLAINT**

Plaintiff L.E.A.R.[1] is a survivor of human trafficking. L.E.A.R. applied for a nonimmigrant T visa pursuant to 8 U.S.C. § 1101(a)(15)(T). She sought, and received, a waiver of inadmissibility from an Immigration Judge pursuant to Seventh Circuit precedent. The Defendant Department of Homeland Security (DHS) did not appeal that waiver grant. Then, however, Defendants U.S. Citizenship and Immigration Services (USCIS) simply gave it no effect, adjudicating her application as if her waiver had not been granted.

---

[1] Plaintiff is asking leave to file this action under an initialed pseudonym for reasons stated in a separately-filed motion.

1

Plaintiff seeks declaratory and other relief, to vindicate the order of the Immigration Judge in her case.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331, general federal question jurisdiction.

2. Under 28 U.S.C. § 1391(e), venue is proper in the United States District Court for the Northern District of Illinois because it is the judicial district in which Plaintiff resides.

## THE PARTIES

3. L.E.A.R. (an initialed pseudonym) is a survivor of human trafficking, who has applied for a T visa with USCIS.

4. The Department of Homeland Security (DHS) is a federal cabinet-level department of the U.S. government. It is responsible for implementing and enforcing the Immigration and Nationality Act (INA) and an "agency" within the meaning of the Administrative Procedure Act. Its components include U.S. Citizenship and Immigration Services (USCIS).

5. Defendant United States Citizenship and Immigration Services (USCIS) is a bureau within DHS and an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1); 6 U.S.C. § 271. USCIS is responsible for adjudicating

2

applications for immigration benefits, and is responsible for adjudicating applications by victims of human trafficking.

**ADMINISTRATIVE PROCEDURE ACT AND DECLARATORY JUDGMENT ACT FRAMEWORK**

6. Under the Administrative Procedure Act (APA), the Court is authorized to overturn agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

7. The Declaratory Judgment Act permits "any court of the United States, upon the filing of an appropriate pleading, [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

8. Plaintiff asks the Court to issue a declaration, clarifying the relevant rights and relations of the parties, and specifically, whether USCIS had authority to decline to give effect to the order of the Immigration Judge, granting a waiver under 8 U.S.C. § 1182(d)(3), in its adjudication of Plaintiff's application for status as a victim of human trafficking.

**BACKGROUND ON HUMAN TRAFFICKING**

9. The purpose of the nation's laws governing human trafficking is to abolish modern forms of slavery.

3

10. The T visa was created as part of the Victims of Trafficking and Violence Protection Act to combat human trafficking, protect victims of trafficking, and increase punishment of traffickers. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464 (2000) [hereinafter VTVPA], *see also* 22 U.S.C.A. § 7101.

11. When the VTVPA was enacted in 2000, Congress explained that "Victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation." 22 U.S.C. § 7101(b)(19).

12. A trafficking survivor may be granted a nonimmigrant T visa, which can lead to immigrant status if a later application is granted. 8 U.S.C. § 1101(a)(15)(T).

13. At the time it enacted protections for victims of human trafficking, Congress also enacted protections for victims of designated other offenses, such as involuntary servitude. VTVPA § 1513, 114 Stat. at 1533. That visa is known as the U visa. 8 U.S.C. § 1101(a)(15)(U). Some trafficking offenses are also designated offenses for purposes of a U visa; thus, a victim of

human trafficking may be eligible for both a T visa and a U visa if the offense occurs in the United States.

14. In order for a victim of human trafficking to be granted a visa as a trafficking survivor, she must either be admissible under 8 U.S.C. § 1182, or, if she has triggered any inadmissibility grounds, she must obtain a waiver for that inadmissibility.

15. A survivor of human trafficking may waiver inadmissibility either under the general nonimmigrant waiver statute, 8 U.S.C. § 1182(d)(3), or under a statute specific to victims of human trafficking. 8 U.S.C. § 1182(d)(13); 8 C.F.R. § 212.16(a).

16. When Congress created T and U visas, it vested in the Attorney General the discretion to grant the visas and waivers of inadmissibility.[2] VTVPA § 107(e)(3), 114 Stat. 1464, 1478, §1513(e), 114 Stat. 1536.

17. In 2006, aiming to ensure that T and U visa applications were adjudicated by a dedicated office within DHS, Congress specified that T and U visas themselves may be granted by USCIS. Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109–62, § 821(c), 119 Stat. 2960, 3062 (2006); *see also* 8 C.F.R. §§ 214.11(d), 214.14(c).

---

[2] The Attorney General may delegate its powers and duties to immigration judges. 8 C.F.R. § 1003.10(b).

      Congress also transferred the responsibility of granting inadmissibility waivers for T and U visa applicants to USCIS. *Id.* § 821(c), 119 Stat. at 3062.

18. However, this legislation has been found by the Seventh Circuit not to affect preexisting Immigration Judge authority under 8 U.S.C. § 1182(d)(3) to waive admissibility for nonimmigrants.

19. In *L.D.G. v. Holder*, the Seventh Circuit held notwithstanding the regulations giving USCIS sole jurisdiction to grant nonimmigrant visas, "the plain language of section 1182(d)(3)(A) grants to the Attorney General authority to waive the inadmissibility of an [individual] applying for a temporary nonimmigrant visa." 744 F.3d 1022, 1030 (7th Cir. 2014) (internal quotations omitted); *see also Atunnise v. Mukasey*, 523 F.3d 830, 837–38 (7th Cir. 2008).

20. Moreover, the Seventh Circuit found concurrent jurisdiction between the Attorney General and USCIS over inadmissibility waivers for nonimmigrant visas "offers efficiency advantages" for a notoriously backlogged immigration system. *L.D.G.*, 744 F.3d at 1031.

## FACTUAL ALLEGATIONS

21. Plaintiff L.E.A.R. is indisputably a victim of a severe form of trafficking in persons.

22. At the age of 19, L.E.A.R. was preyed upon by an international sex trafficking ring that transported girls from Mexico to the United States for the purpose of commercial sexual exploitation.

23. Traffickers used fraudulent promises of well-paid work in the United States that would provide L.E.A.R. financial security and an escape from threats she received in Mexico.

24. Traffickers lured L.E.A.R. and two other teenage girls from Mexico to Chicago, Illinois.

25. Upon arrival to Chicago, L.E.A.R. learned the true intentions of her traffickers. L.E.A.R. and other girls were forced to stay in a small room in the back of an establishment, which was locked from the outside. The windows had iron rods that prevented L.E.A.R. from escaping. Moreover, an armed security guard sat outside of the room where L.E.A.R. was kept.

26. L.E.A.R. and other girls managed to escape when her traffickers took her to the store to purchase revealing clothing to entertain clients at the establishment.

27. After L.E.A.R. escaped, she and her family members who remained in Mexico received continuous threats from her traffickers. L.E.A.R.'s family received phone calls demanding to know where L.E.A.R. was and

7

threatened the family with death for not having paid the debt owed for transporting L.E.A.R. to the United States.

28. Facing homelessness and the dangerous traffickers who were actively searching for her, L.E.A.R. hid at the first available refuge she could find.

29. L.E.A.R. went to live and work for a woman who she knew as "Paula."[3] L.E.A.R. soon realized, however, that Paula and others that entered the home were involved in drug crimes. L.E.A.R. could not escape from Paula.

30. In August 2001, Paula coerced L.E.A.R. to unknowingly participate in a crime.

31. Paula accused L.E.A.R. of stealing money from her, which L.E.A.R. vehemently pleaded was untrue. Paula insisted the only way L.E.A.R. would be able to clear her name was to find out whether another individual had access to the home.

32. Paula instructed L.E.A.R. to accompany two men to go to the landlord's home to see whether the landlord had a spare key of Paula's apartment. According to Paula, if the landlord had a spare key, then the landlord was the person who had stolen the money.

---

[3] This name has been altered.

8

33. L.E.A.R. resisted the request, but after threats that her family in Mexico would be hurt if she did not cooperate, L.E.A.R. followed orders.

34. The landlord's wife opened the door when L.E.A.R. knocked to ask for the spare key. The two men accompanying L.E.A.R. apprehended L.E.A.R. and the landlord's wife, and forcibly transported them to another house seeking to extort money from the landlord.

35. L.E.A.R. was arrested for her involvement in Paula's scheme to extort money from the landlord. L.E.A.R. spent a short time in jail and was later released on bond.

36. Young and unfamiliar with the United States legal system, L.E.A.R. did not understand the case was still pending and had to return to court until the case was adjudicated. The brief arrest allowed her to escape from Paula.

37. For the next 13 years, L.E.A.R. lived a non-violent life and tried to recover from her trafficking experience. L.E.A.R. had no other history of arrests or convictions. Indeed, L.E.A.R. was not aware a warrant had been issued for her arrest; she never received a written or telephonic notice stating she needed to report to court.

38. In 2014, law enforcement officers arrived at L.E.A.R.'s home asking her to accompany them to discuss the incident from 2001. L.E.A.R. cooperated with the officers.

39. L.E.A.R. disclosed to her criminal defense attorney the human trafficking she survived and the subsequent victimization she suffered; however, the issue was not identified as human trafficking and was never communicated to the state prosecutor or judge.

40. Under advice of her criminal defense attorney, L.E.A.R. pleaded guilty to the crime of aggravated unlawful restraint in December 2016. Thereafter, L.E.A.R. spent ten months in criminal custody before she was transferred to DHS custody in October 2017.

41. On January 8, 2018, L.E.A.R. submitted an application and supporting documents for a T nonimmigrant visa pursuant to 8 U.S.C. § 1101(a)(15)(T).

42. A letter from the FBI was included with her trafficking application, which confirms these details.

43. L.E.A.R. also presented affidavits by experts in human trafficking, explaining that L.E.A.R.'s criminal involvement and her entrance to the United States without prior permission was due to the trafficking situation in which she found herself.

44. L.E.A.R.'s conviction as well has her lack of legal permission to be in the United States render her "inadmissible" to the United States. Thus, she requires a waiver in order to be approved for a T-1 visa.

45. On October 29, 2018, L.E.A.R. submitted an application and supporting documents for a U nonimmigrant visa pursuant to 8 U.S.C. § 1101(a)(15)(U).

46. L.E.A.R. presented similar documents for her U visa application as her T visa application.

47. With her U visa application, L.E.A.R. submitted a letter from the FBI confirming the details of her trafficking and expert affidavits explaining her criminal involvement and her entrance to the United States without prior permission was due to the trafficking situation in which she found herself.

48. L.E.A.R. requires a waiver in order to be approved for a U-1 visa due to her conviction as well has her lack of legal permission to be in the United States.

49. DHS released L.E.A.R. from its custody on March 13, 2019.

50. None of the facts here are disputed.

## PROCEDURAL HISTORY

51. L.E.A.R. was placed into removal proceedings on September 11, 2017.

52. L.E.A.R. applied for a T nonimmigrant visa on January 8, 2018.

53. She applied for a U nonimmigrant visa on October 29, 2018.

54. In removal proceedings, L.E.A.R. appeared before Immigration Judge Samuel Cole. She sought a waiver under 8 U.S.C. § 1182(d)(3).

55. On December 13, 2018, after L.E.A.R. presented evidence in support of the waiver, Judge Cole granted the application, without opposition from DHS. Ex. A, Order of the Immigration Judge. Judge Cole specified in granting the waiver that it applied to both the U and T visa application.

56. Judge Cole ordered removal simultaneously with the waiver grant. This approach has been upheld by the Seventh Circuit. *Meza Morales v. Barr*, 973 F.3d 656, 663 (7th Cir. 2020).

57. Judge Cole's order, granting the waiver and ordering removal, became final when both sides waived their right to appeal. 8 C.F.R. § 1003.39.

58. In the context of applying for a T visa, L.E.A.R. informed defendants USCIS and DHS that she had been granted a waiver by Judge Cole.

59. Despite Judge Cole's order and DHS's waiver of the right to appeal, USCIS found that the 8 U.S.C. § 1182(d)(3) waiver did not apply to L.E.A.R.'s T visa application. Ex. B, USCIS Decision.

60. L.E.A.R. filed a timely appeal to the Administrative Appeals Office (AAO), within USCIS. The AAO lacked jurisdiction to consider the merits

of the waiver denial, but had jurisdiction to determine whether L.E.A.R. needed a waiver.

61. On appeal, L.E.A.R. argued Judge Cole had authority to grant her 8 U.S.C. § 1182(d)(3) inadmissibility waiver for the purpose of obtaining a T visa, and had done so.

62. The AAO denied the appeal on November 30, 2020. Ex. C, AAO Decision. The AAO concluded that Seventh Circuit precedent under *L.D.G. v. Holder* did not apply to L.E.A.R.'s case because *L.D.G.* did not address T visas specifically. *Id.* at 2.

63. The AAO also found that "The Applicant does not cite any legal authority to show that an Immigration Judge has authority to grant a waiver of inadmissibility under section 212(d)(13) [8 U.S.C. § 1182(d)(13)] of the Act for T applicants." *Id.* Notably, L.E.A.R. did not apply for a waiver pursuant to 8 U.S.C. § 1182(d)(13); she applied for the general nonimmigrant waiver under § 1182(d)(3).

64. There is no further administrative appeal possible from that decision.

## CLAIMS FOR RELIEF
## COUNT ONE (ADMINISTRATIVE PROCEDURES ACT)

65. The allegations contained in paragraphs 1 through 64 are repeated and realleged as if fully set forth herein.

13

66. Once Defendant DHS waived appeal of the grant of the § 1182(d)(3) waiver, the decision became final. 8 C.F.R. § 1003.39.

67. An immigration judge exercises the authority of the Attorney General, and the final order of an immigration judge is binding on Defendant DHS. 8 U.S.C. § 1103(a)(1).

68. Judge Cole's waiver grant specifically found applicability to both the T visa and U visa context.

69. The Seventh Circuit's reasoning likewise found that an Immigration Judge could "make a global resolution of waiver requests under section 1182(d)(3)," reasoning that this approach "offers efficiency advantages over compartmentalizing waiver decisions whenever a statute gives a second agency more targeted waiver authority." *L.D.G.*, 744 F.3d at 1031.

70. Defendants offer little logical support for their contention that the waiver grant does not apply in the T visa context. USCIS seems to believe that any language applying to this question in *L.D.G.* is dicta because that case involved a U visa. Plaintiff acknowledges that the noncitizen in *L.D.G.* was seeking a U visa, but *L.D.G.*'s analysis was not dicta but was reasoning that explained the decision of the Court. In this circuit, a "global" waiver is available in removal proceedings; this means that a waiver under § 1182(d)(3) applies to both T and U visas.

14

71. Further, there is no distinction under the statute between waiver grants under § 1182(d)(3) depending on whether the purpose of the waiver is for a nonimmigrant T visa or a nonimmigrant U visa. The same statute applies in both cases in precisely the same way.

72. USCIS was bound to adjudicate the T visa application while giving effect to Judge Cole's waiver grant.

73. Plaintiff therefore asks the Court to overturn and vacate the USCIS decisions against her, for being "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

## COUNT TWO (DECLARATORY JUDGMENT)

74. The allegations contained in paragraphs 1 through 73 are repeated and realleged as if fully set forth herein.

75. Plaintiff asks the Court to issue a declaration, clarifying the relevant rights and relations of the parties, and specifically, whether defendants are bound to give effect to the Immigration Judge's grant of a waiver under § 1182(d)(3) in the context of a human trafficking survivor.

## PRAYER

WHEREFORE, Petitioner respectfully asks the Court to:

15

1. Find that the Defendants' adjudication of Plaintiff's T visa application was erroneous as a matter of law in failing to give effect to the final, unappealed decision of the immigration judge;

2. Declare that the Immigration Judge's order in removal proceedings is binding on the parties unless properly reopened;

3. Vacate the decision of Defendant USCIS and remand for further proceedings; and

4. Grant such other relief as the Court deems necessary and proper.

Date: October 19, 2021　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　/s Charles Roth_____
　　　　　　　　　　　　　　　　　　　　Charles Roth
　　　　　　　　　　　　　　　　　　　　Karla Olivas
　　　　　　　　　　　　　　　　　　　　National Immigrants Justice Center
　　　　　　　　　　　　　　　　　　　　224 South Michigan Ave., Suite 600
　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60604
　　　　　　　　　　　　　　　　　　　　T: (312) 660-1613
　　　　　　　　　　　　　　　　　　　　F: (312) 660-1505
　　　　　　　　　　　　　　　　　　　　croth@heartlandalliance.org
　　　　　　　　　　　　　　　　　　　　kolivas@heartlandalliance.org